## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

WALTER RONALDO MARTINEZ
ESCOBAR (2),

Defendant.

Case No. 15-cr-260 (PAM/TNL)

**REPORT AND
RECOMMENDATION**

---

LeeAnn K. Bell, Assistant United States Attorney, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Mark D. Nyvold, 7671 Central Avenue NE, Suite 207, Fridley, MN 55432 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion under Rule 14 to Sever Defendants, (ECF No. 299), and Motion to Suppress Evidence Obtained through Search and Seizure, (ECF No. 300). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Paul A. Magnuson, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A motions hearing was held February 9, 2016. (ECF No. 340). Assistant United States Attorney LeeAnn K. Bell appeared on behalf of the United States of America (the "Government"). Mark D. Nyvold appeared on behalf of Defendant Walter Ronaldo Martinez Escobar. Regarding Defendant's Motion Under Rule 14 to Sever Defendants,

(ECF No. 299), Defendant and the Government rested upon their filings and additional briefing. (ECF Nos. 299, 322, 344, 357). Regarding Defendant's Motion to Suppress Evidence Obtained Through Search and Seizure, (ECF No. 300), the Government submitted a Wisconsin state court search warrant, (Ex. 4; *see* Tr. 80:15–25, ECF No. 400), and the Court heard testimony from Special Agent Chad Visger.

Post-hearing briefing is complete and these motions are ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, the undersigned recommends that Defendant's motions be denied.

## I.   MOTION FOR SEVERANCE

Defendant seeks to sever his trial from that of his co-defendants. "When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995). These rules "are liberally construed in favor of joinder." *United States v. Rimell*, 21 F.3d 281, 288 (8th Cir. 1994); *Darden*, 70 F.3d at 1526. The propriety of joinder "must appear on the face of the indictment." *United States v. Bledsoe*, 674 F.2d 647, 655 (8th Cir. 1982) (citations omitted).

Rule 8 of the Federal Rule of Criminal Procedure allows for the joinder of offenses and defendants in criminal cases. Under Rule 8(a), offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Under Rule 8(b), defendants may be joined if "they are alleged to have participated

2

in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The defendants "may be charged in one or more counts together or separately" and "need not be charged in each count." Fed. R. Crim. P. 8(b); *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) ("Importantly, not every defendant joined must have participated in every offense charged.") (citation omitted).

In general, "persons charged in the same offense should be tried together, especially when proof against them is based upon the same evidence or acts." *United States v. Voss*, 787 F.2d 393, 401 (8th Cir. 1986); *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996) ("Where codefendants are charged with the same crimes, including conspiracy, and the crimes of the codefendants will be proved by the same evidence, joint trials are generally favored.") (citation omitted). "Trying codefendants together not only conserves scarce time and resources, but also 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'" *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) (quoting *Darden*, 70 F.3d at 1528).

Here, Defendant is charged, alongside twelve others, with conspiracy to distribute methamphetamine between December 2014 and August 2015. (Superseding Indictment, ECF No. 94). Given the nature of drug conspiracy crimes, where drugs are passed from suppliers to distributors, the Government will need to prove the supply-chain links between the alleged co-conspirators. This means that evidentiary proof, secured via wiretaps, tracking devices, and other methods, will likely overlap because, as the

Government notes, many of the co-defendants communicated with each other via telephones or otherwise coordinated their activities. (*See generally* ECF No. 357, at 2). Thus, joinder of offenses and defendants was proper under Rule 8 given the common scheme and acts alleged.

Although Rule 8 permits joinder, "a trial court may order separate trials on different counts, or sever certain defendants' cases from others', to protect defendants' fair-trial rights." *Delpit*, 94 F.3d at 1143 (citing Fed. R. Crim. P. 14(a); *Darden*, 70 F.3d at 1527). Where multiple defendants have been charged in the same indictment, "there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice." *Hively*, 437 F.3d at 765 (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Cooper*, 2006 WL 2095217, at *2 (N.D. Iowa 2006) ("There is a presumption against severing properly joined cases, and such presumption is a 'strong' one.") (citing *Delpit*, 94 F.3d at 1143). The party seeking severance has the burden of showing a clear likelihood of prejudice. *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002). Moreover, "[s]everance is never warranted simply because the evidence against one defendant is more damaging than against another." *Hively*, 437 F.3d at 765. This remains true even if severance might increase the likelihood that a defendant will be acquitted. *Id.*; *United States v. Anthony*, 565 F.2d 533, 538 (8th Cir. 1977).

Defendant asserts that failure to sever his trial from that of his co-defendants presents prejudicial concern in that the jury cannot reasonably be expected to compartmentalize the evidence as it relates to separate defendants, causing confusion. Defendant asserts that evidence will be confusing to the jury because Jesse Howard

Garcia obtained methamphetamine from one group of defendants and then distributed it via a different group of defendants. (ECF No. 344, at 10–11). "Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect.'" *Hively*, 437 F.3d at 765 (quoting *Mickelson*, 378 F.3d at 817). Where there is only some risk of prejudice by joinder, proper jury instructions can cure the risk of prejudice. *Zafiro*, 506 U.S. at 540; *Mickelson*, 378 F.3d at 818 ("The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions."); *see also United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003) ("In our consideration of the jury's ability to compartmentalize the evidence against the joint defendants, we consider 1) the complexity of the case; 2) if one or more of the defendants were acquitted; and 3) the adequacy of admonitions and instructions by the trial judge."). Here, Defendant does not argue that a limiting instruction would not alleviate prejudice. As noted above, evidentiary proof against the defendants will likely be the same because the Government will need to prove the links of the conspiracy from Jesse Garcia to Defendant. This Court finds that adequate jury instructions and admonitions by the trial judge would be sufficient in this case to assist the jury's ability to compartmentalize the evidence and prevent prejudice.

The benefits of a joint trial in this case are compelling. All defendants are charged in a single conspiracy. The overlapping evidence will give the jury the best perspective, increasing the likelihood of a correct outcome. A joint trial will also conserve scarce judicial time and resources. Defendant has not demonstrated a clear likelihood of

prejudice. Therefore, this Court recommends that Defendant's motion to sever be denied without prejudice.

## II.  MOTION TO SUPPRESS

### A.  Findings of Fact

Special Agent Chad Visger ("SA Visger") is employed by the Department of Homeland Security, Drug Enforcement Administration in Minneapolis, Minnesota. (Tr. 82:22–83:3). SA Visger has been in law enforcement since 2005 and with Homeland Security since 2008. (Tr. 83:8–15). SA Visger is assigned to a unit that investigates large-scale drug conspiracies and trafficking. (Tr. 83:19–25). On August 19, 2015, SA Visger was working in the area of Prescott, Wisconsin, near a farm house that law enforcement believed served as a drug stash house. (Tr. 84:6–23). Prior to that date, law enforcement learned through a series of intercepted telephone calls that an exchange of 50 pounds of methamphetamine would take place at the Prescott house on August 19, 2015. (Tr. 84:24–85:4). The following facts detail the investigation leading up to August 19, 2015 and the events of that day.

On March 25, 2015, law enforcement conducted a traffic stop on a vehicle leaving the Burnsville, Minnesota residence of Jesse Garcia, a co-defendant in this criminal proceeding. (Tr. 85:5–86:7). The vehicle was driven by co-defendants Noyola and Andrade, with a search recovering $45,000 cash and Andrade's cell phone that contained photographs of large bundles of cash, wire transfers (some of which were to Mexico), and Andrade posing with firearms (including a handgun and rifle). (Tr. 85:5–86:7). SA

Visger was able to recognize the outside of the Prescott house from some of the photographs. (Tr. 86:8–16).

Surveillance was conducted on the Prescott house in an attempt to determine who was living at and frequenting the residence. (Tr. 86:16–23). SA Visger saw two individuals frequently at the Prescott house, Andrade and Noyola. (Tr. 86:24–87:3). Later in the surveillance, SA Visger observed a third individual, Defendant, frequent the Prescott house and appeared to be living there. (Tr. 86:24–87:3). SA Visger also saw various vehicles that would frequent the Prescott house, including a gold Honda Accord on a near daily basis, that was most commonly driven by Defendant. (Tr. 87:4–11). SA Visger also saw Noyola drive the gold Honda Accord on occasion, but Noyola was more often a passenger. (Tr. 87:4–11). SA Visger saw that Andrade also drove it infrequently, with Noyola as the passenger. (Tr. 87:4–11). SA Visger observed Andrade firing a handgun outside of the Prescott house and "just generally playing with it, for lack of a better term." (Tr. 87:20–88:1).

Pursuant to a wiretap, Jesse Garcia's telephone communications were being intercepted. (Tr. 88:2–11). On August 16–17, 2015, law enforcement intercepted a series of telephone calls from Andrade to Jesse Garcia discussing money owed by Jesse Garcia for methamphetamine. (Tr. 88:9–25). Law enforcement believed that Andrade was Jesse Garcia's methamphetamine source of supply. (Tr. 113:17–23). The conversations indicated that Jesse Garcia would meet someone at the Holiday Point gas station in Hastings, Minnesota on August 17, 2015. (Tr. 89:1–12, 90:3–21). Law enforcement did not make it to the gas station on time, so they went to the Prescott house to see what

7

activity they could observe. (Tr. 90:22–91:25). On the way there, SA Visger was passed by the gold Honda Accord that frequented the Prescott house. (Tr. 90:22–91:25). As it passed, SA Visger recognized Noyola and Defendant as the occupants. (Tr. 92:1–8, 132:12–133:11). Law enforcement followed the gold Honda Accord as it went toward Hudson, Wisconsin, eventually stopping at a Wal-Mart store. (Tr. 92:9–13, 119:10–120:8). Law enforcement followed Noyola and Martinez as they entered the Wal-Mart, observing them at the money wiring counter. (Tr. 92:14–24, 119:10–120:8, 132:12–133:11). Law enforcement then observed Noyola and Defendant return to the Prescott house. (Tr. 95:2–4). Law enforcement then intercepted a telephone call from Andrade to Jesse Garcia that indicated the money had been received, asking when more money would be ready. (Tr. 96:16–97:9).

On August 18, 2015, SA Visger reviewed the security footage of the Holiday Point gas station in Hastings, Minnesota. (Tr. 95:5–20, 115:4–12). Upon reviewing the footage, SA Visger saw Jesse Garcia pull up to a gas pump, exit to fuel his vehicle, and enter the store for a period of time. (Tr. 95:21–96:15). The gold Honda Accord arrived at the gas station and parked off camera. (Tr. 95:21–96:15). Noyola then came into camera view from the same direction the car parked and entered the store to purchase something. (Tr. 95:21–96:15). Jesse Garcia returned to the gas pump, Noyola exited the store toward where the gold Honda Accord was parked, and Jesse Garcia pulled his vehicle around to the same location. (Tr. 95:21–96:15). Defendant was not directly seen on the security footage. (Tr. 119:3–9, 115:4–12).

Law enforcement intercepted a telephone call on August 18, 2015, where Andrade, using Defendant as a Spanish-English interpreter, informed Jesse Garcia that they had 50 pounds of methamphetamine set aside for Jesse Garcia. (Tr. 97:10–98:2, 117:2–25). During that call, Jesse Garcia indicated he needed time to get money together for the purchase. (Tr. 98:3–9). On August 19, 2015, Jesse Garcia communicated with Andrade, indicating that the money was ready and arranged a meet. (Tr. 98:10–99:3). Law enforcement, via periodic drive-by surveillance, believed the Prescott house would be the meet location given the vehicles then present, including the gold Honda Accord. (Tr. 99:4–100:3). Law enforcement observed Jesse Garcia drive into Wisconsin towards the Prescott house. (Tr. 100:4–22). Jesse Garcia's vehicle eventually left the location of the Prescott house and was stopped after he crossed back into Minnesota. (Tr. 100:23–101:9). When the vehicle was stopped, law enforcement found 50 pounds of methamphetamine in the trunk. (Tr. 101:10–13).

SA Visger observed the gold Honda Accord leave the area of the Prescott house, with law enforcement following it toward Hudson, Wisconsin. (Tr. 101:14–102:7, 121:17–122:9). SA Visger informed law enforcement that he would be executing a "high-risk stop, felony stop [of the gold Honda Accord], based on the crime I believed had just been committed, and the weapons I had seen at the house, et cetera." (Tr. 102:8—103:14). SA Visger testified that a high-risk stop involves an "alerted level of approach" associated with serious crimes, such as a transaction for over one million dollars of methamphetamine, and where law enforcement reasonably assumes weapons may be involved. (Tr. 102:19–103:14). SA Visger and his partner, who was driving a separate

vehicle, initiated a stop of the gold Honda Accord as it entered Hudson by activating their emergency lights and siren. (Tr. 102:8–18, 122:10–123:16, 126:12–16). The gold Honda Accord stopped immediately. (Tr. 124:18–125:8). Other law enforcement arrived on scene as the traffic stop unfolded, mostly assisting with traffic control. (Tr. 122:10–124:13. 125:14–126:9).

Defendant was driving the gold Honda Accord and Noyola was the passenger. (Tr. 103:15–18). SA Visger wore a vest that had clear law enforcement markings, drew his M4 rifle, and used his vehicle's door as cover. (Tr. 104:10–12, 122:10–125:13). SA Visger ordered Defendant to remove the keys from the ignition, place the keys on the dash, open the door, exit with his hands up, and back up toward law enforcement. (Tr. 122:10–125:13). Defendant and Noyola complied. (Tr. 122:10–125:13, 104:10–12). Defendant and Noyola were then handcuffed and separated. (Tr. 104:13–14, 126:12–127:19). One of the occupants indicated they had come from the Prescott house. (Tr. 105:17–24).

SA Visger called for a canine unit to conduct a sniff of the vehicle, and made several calls to other law enforcement agencies because of the multiple agencies and jurisdictions involved, including various Wisconsin counties and cities, to inform and coordinate operations. (Tr. 104:13–24). The St. Croix County Sheriff's Office responded with a canine unit. (Tr. 108:2–8). SA Visger testified that he believes it took about 30 minutes for the canine unit to arrive, but is unsure because he was handling other matters such as coordinating with other law enforcement entities. (Tr. 128:20–129:7). The police dog alerted to the rear of the vehicle, around the trunk area. (Tr. 108:5–11, 110:11–16,

129:8–12). Once the dog alerted, law enforcement searched the vehicle. (Tr. 110:11–16, 129:13–130:7). Nothing illegal was located in the vehicle. (Tr. 129:13–130:7).

At the time of stopping the gold Honda Accord, SA Visger did not know Defendant or Noyola by name, only by sight. (Tr. 103:19–104:9). While SA Visger was making telephone calls, law enforcement was attempting to identify Defendant and Noyola. (Tr. 104:25–107:10, 127:20–128:4). The names Defendant and Noyola provided to law enforcement on August 19, 2015, are not the names they are currently charged under in this criminal proceeding. (Tr. 104:25–107:10). Defendant provided the name Indalesio Martinez, which was the registered owner of the gold Honda Accord. (Tr. 106:16–24). Also during this process, law enforcement determined that neither Defendant nor Noyola had a valid driver's license. (Tr. 107:11–16). Because neither had a valid driver's license, law enforcement would not let them drive away in the car and had the car towed. (Tr. 107:17–108:1, 110:17–111:24). Defendant and Noyola were transported off the highway into town by local law enforcement. (Tr. 110:17–111:24).

Law enforcement then executed a search warrant at the Prescott house. (Tr. 112:4–10, 131:22–132:5; *see* Ex. 4). During the search, law enforcement found approximately 30 pounds of methamphetamine. (Tr. 112:4–10, 131:5–7). After law enforcement executed a search warrant at the Prescott house, SA Visger directed local law enforcement to locate and arrest Defendant and Noyola. (Tr. 111:25–112:14). Defendant and Noyola were located in Hudson, not far from the Wal-Mart, and taken into custody by the St. Croix County Sheriff's Office. (Tr. 112:11–113:6).

### B.  The Traffic Stop

Defendant asserts that law enforcement had no legal basis for stopping Defendant on August 19, 2015. Defendant further argues that, even if law enforcement had a legal basis for the stop, the scope and duration of the stop was illegally exceeded. Defendant moves to suppress all evidence derivative of this stop, including statements made in interviews with law enforcement on August 20 and 21, 2015.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. An "officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) ("Where a police officer has reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion.") (citations omitted). "In determining whether an officer had a particularized and objective basis for suspecting legal wrongdoing, [courts] must look at the totality of the circumstances, allowing officers to draw on their experience and training." *Hughes*, 517 F.3d at 1016 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity" in light of all the circumstances from which "a trained officer draws inferences and makes deductions . . . that might well elude an untrained

person."). Officers conducting such investigative stops "may take steps reasonably necessary to protect their personal safety." *United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008) (quoting *United States v. Shranklen*, 315 F.3d 959, 961 (8th Cir. 2003)).

Here, SA Visger was involved in an investigation of Jesse Garcia's methamphetamine trafficking for at least five months. During that investigation, a vehicle driven by Noyola and Andrade was stopped with $45,000 cash and photographs showing Andrade with firearms and bundles of cash. At least some of those photographs were taken at the Prescott house. Surveillance of the Prescott house showed three frequent occupants or visitors: Andrade, Noyola, and Defendant. These three were often seen using a gold Honda Accord, with Defendant as its most frequent driver. Observation also showed Andrade firing a handgun while at the Prescott house.

A flurry of activity was intercepted on Jesse Garcia's telephone from August 16 through 19, 2015. On August 16 and 17, Jesse Garcia coordinated payment to his methamphetamine supplier. The conversations indicated Jesse Garcia would meet someone at a gas station in Hastings, Minnesota. Law enforcement observed video surveillance that showed Jesse Garcia at that gas station, as well as the gold Honda Accord and Noyola. Law enforcement then located the gold Honda Accord, driven by Defendant, with Noyola as a passenger. Law enforcement followed the gold Honda Accord to a Wal-Mart where Noyola conducted a wire transfer. Defendant and Noyola then returned to the Prescott house. A telephone call to Jesse Garcia indicated that money had been received and asked when more money would be ready. On August 18 and 19,

Jesse Garcia set up a meeting for the purchase of 50 pounds of methamphetamine from Andrade. On August 19, 2015, Jesse Garcia was observed driving to the Prescott house. Law enforcement then observed that Jesse Garcia and the gold Honda Accord leave the Prescott house. Law enforcement stopped Jesse Garcia with 50 pounds of methamphetamine in his vehicle. Law enforcement then stopped Defendant's vehicle.

Law enforcement had reasonable, articulable suspicion that criminal activity was afoot. Mainly, law enforcement learned of a possible transaction for 50 pounds of methamphetamine at the Prescott house. After leaving the area of the Prescott house, Jesse Garcia was stopped with 50 pounds of methamphetamine in his vehicle. The gold Honda Accord, seen previously in coordination with Jesse Garcia's activities, left the area of the Prescott house. Law enforcement had observed Andrade, a frequent visitor or occupant of the Prescott house, in photographs with firearms and using firearms at the Prescott house. Under the totality of the circumstances, it was reasonable for law enforcement to believe that the occupants of the gold Honda Accord had come from a methamphetamine transaction and that they may have had weapons, illegal drugs, or cash from an illegal drug transaction. *See United States v. Spotts*, 275 F.3d 714, 716 (8th Cir. 2002) (holding police had articulable and objective basis to make investigatory stop where the police suspected defendant was distributing methamphetamine and had a 9mm gun, police saw defendant stop at suspected drug house and exit his vehicle for a short time the night before they executed search warrant at the house, and defendant drove slowly by the house during execution of the warrant).

An investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir. 1999). During an investigative stop, officers should "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose" of the temporary seizure. *Id.* "The means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). During the course of conducting an investigation, law enforcement is authorized to "take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *United States v. Robinson*, 670 F.3d 874, 877 (8th Cir. 2012) ("It is well established . . . that police officers may handcuff a suspect and place him in a patrol car during an investigative stop in order to protect their personal safety and maintain the status quo.").

In this case, as noted above, it was reasonable for law enforcement to believe that the occupants of the gold Honda Accord had come from a methamphetamine transaction and that they may have had weapons, illegal drugs, or cash from an illegal drug transaction. This context justified law enforcement's removal of the occupants at gunpoint, handcuffing them, and placing them in separate squad cars as steps reasonably necessary to protect the officers' personal safety. Once law enforcement secured Defendant and Noyola, they began the task of attempting to identify them. This took considerable effort and time because both men provided different names than the ones

they are currently charged under. The detention here was reasonable given the serious crime at issue and the possible danger Defendant and Noyola posed. *See United States v. Lego*, 855 F.2d 542, 545 (8th Cir. 1988) (holding that confining a potentially dangerous suspect to a patrol car while checking his identification was not tantamount to an arrest because the exigencies of the situation authorized the officer to continue the *Terry* stop by confining the suspect to the patrol car "until the situation stabilized and she could determine if full custodial arrest and detention were warranted."). Once law enforcement became reasonably sure of the identities of Defendant and Noyola, and learned that the vehicle contained no evidence of illegal activity, the two were released.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). "[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005). "In making the probable-cause determination, [courts] 'apply a common sense approach and consider all relevant circumstances.'" *Vore*, 743 F.3d at 1179 (quoting *Kennedy*, 427 F.3d at 1141).

As noted above, it was reasonable for law enforcement to believe that the occupants of the gold Honda Accord had come from a methamphetamine transaction and that they may have had weapons, illegal drugs, or cash from an illegal drug transaction. Thus, under the totality of the circumstances, law enforcement had sufficient probable cause to believe there was a fair probability that contraband or evidence of a crime would be found within the vehicle.

Based on the foregoing analysis, the Court concludes that law enforcement had probable cause for the initial stop and to remove Defendant from the vehicle, handcuff him, and place him in the back of the squad car while the officers attempted to identify him and to search the vehicle. Further, law enforcement had probable cause to believe there was a fair probability that contraband or evidence of a crime would be found within the vehicle, justifying the search of the vehicle. Therefore, the Court recommends that Defendant's motion be denied.

### C. The Search Warrant

Defendant argues that the warrant for the Prescott house does not state probable cause.

"The Fourth Amendment requires that search warrants be supported by probable cause." *United States v. Tripp*, 370 F. App'x 753, 757 (8th Cir. 2010) (citation omitted). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation

omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). The sufficiency of the affidavit is evaluated using a totality-of-the-circumstances approach. *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing court relies solely on an affidavit to establish probable cause, only the information found within the four corners of the affidavit may be considered. The affidavit must provide the issuing court with a substantial basis to support a finding of probable cause; wholly conclusory statements that the affiant "has cause to suspect and does believe that" illegal activity is occurring "will not do." The affidavit for a search warrant should be examined using a common-sense, non-technical approach. Courts look to the totality of the circumstances to determine whether information provided by a confidential informant is reliable so as to support a finding of probable cause.

*Tripp*, 370 F. App'x at 757 (internal quotations and citations omitted). "A reviewing court should afford great deference to the probable cause determination of the issuing judge." *Tripp*, 370 F. App'x at 757 (citing *Hudspeth*, 525 F.3d at 674). "Anticipatory warrants are . . . no different in principle from ordinary warrants. They require the magistrate to determine (1) that it is now probable that (2) contraband, evidence of a crime, or a fugitive will be on the described premises (3) when the warrant is executed." *United States v. Grubbs*, 547 U.S. 90, 96 (2006).

On August 19, 2015, Wisconsin Circuit Court Judge Joseph Boles issued a search warrant for the Prescott house upon a finding of probable cause that items related to controlled substance crimes would be found therein. (Ex. 4). The accompanying affidavit detailed the methamphetamine distribution of Jesse Garcia. The affidavit states that in February 2015 law enforcement learned Jesse Garcia was involved in drug trafficking, with methamphetamine sources of supply in Minnesota and Wisconsin. In May 2015, law enforcement searched a residence in St. Paul, Minnesota, locating two pounds of methamphetamine, one handgun, and $24,000 cash. On May 25, 2015, law enforcement stopped a vehicle that left Jesse Garcia's residence, driven by Andrade and Yonatan Hernandez-Garcia, finding $45,000 cash. In May 2015, Jesse Garcia made two trips to the Prescott house. Law enforcement believed Andrade and Yonatan Hernandez-Garcia may store large quantities of methamphetamine at the Prescott house because they either lived there or frequented there. On August 17, 2015, SA Visger observed a gold Honda Accord, driven by an unknown Hispanic male and Yonatan Hernandez-Garcia in the passenger seat, come from near the Prescott house and go to a Wal-Mart in Hudson, Wisconsin. At the Wal-Mart, Yonatan Hernandez-Garcia wired $1,000 to a man in Indiana who had previously been identified as a member of a drug trafficking organization. Based on information gathered during the investigation, law enforcement believed Jesse Garcia would travel to the Prescott house on August 19 or 20, 2015 to pick up 50 pounds of methamphetamine. The affidavit indicates that law enforcement will attempt to "interdict the methamphetamine via a traffic stop" once Jesse Garcia returned to Minnesota. If methamphetamine is discovered in Jesse Garcia's possession, then law

enforcement would search the Prescott house. If no methamphetamine was located, law enforcement would not search the Prescott house.

In looking at the sufficiency of the affidavit, the affiant provided an outline of Jesse Garcia's methamphetamine trafficking: a vehicle was stopped by law enforcement after leaving Jesse Garcia's residence, containing $45,000 cash; Jesse Garcia made two trips to the Prescott house; law enforcement believed the Prescott house served as a methamphetamine storage location; law enforcement observed an individual involved in the previous traffic stop leave the Prescott house and make a wire money transfer to an individual associated with drug trafficking. The affidavit indicated that Jesse Garcia would travel to the Prescott house on August 19 or 20, 2015 to secure 50 pounds of methamphetamine. Law enforcement would then stop Jesse Garcia and, if he had methamphetamine, they would search the Prescott house. Under the totality of the circumstances, the affidavit presents sufficient facts to lead a prudent person to believe there was a fair probability that evidence of a crime, mainly drug trafficking, would be found at the Prescott house. *Hudspeth*, 525 F.3d at 674; *Augustine*, 663 F.3d at 372. Based on the foregoing, the Court recommends Defendant's motion challenging the search warrant be denied.

[Continued on next page.]

## III.    RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendant's Motion under Rule 14 to Sever Defendants, (ECF No. 299), be

    **DENIED WITHOUT PREJUDICE**; and

2.  Defendant's Motion to Suppress Evidence Obtained through Search and Seizure,

    (ECF No. 300), be **DENIED**.


Date:  May 9, 2016                                      *s/ Tony N. Leung*
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota

                                                       *United States v. Martinez Escobar*
                                                       Case No. 15-cr-260(2) (PAM/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.